**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                 )
**WAYNE DALEY, NADINE DALEY and**   )
**MDL FISHING, LLC,**                )
                                 )
      **Plaintiffs,**              )
                                 )
**v.**                                  )     **Civil Action No. 05-10720 RWZ**
                                 )
**TWIN DISC, INC., MANN ENGINES AND** )
**COMPONENTS, INC., OCEAN YACHTS,**  )
**INC., and PERFORMANCE DIESEL, INC.,** )
                                 )
      **Defendants.**            )
_____)

**AFFIDAVIT OF PETER G. HERMES IN SUPPORT OF MAN ENGINES AND
COMPONENTS, INC.'S COMPANY'S MOTION FOR SUMMARY JUDGMENT**

I, Peter G. Hermes, am an attorney admitted to the bar of the Commonwealth of
Massachusetts and the bar of the United States District Court of Massachusetts.  I represent
Defendant MAN Engines & Components, Inc. ("MAN Engines"), incorrectly named as "MANN
Engines and Components, Inc.," in the above-referenced case.  True and accurate copies of the
following documents in support of MAN Engines' Motion for Summary Judgment are attached
hereto:

1.      Copy of the Manufacturer's Statement of Origin regarding the 2000 Ocean 48'
Super Sport Yacht with Hull Identification No. XYU13948F900 (the "Yacht"), which was
produced by Plaintiffs during the course of this litigation.

2.      Copy of the Certificate of Documentation regarding the Yacht, which was
produced by Plaintiffs during the course of this litigation and marked as Exhibit 6 at the
Deposition of Wayne Daley.

3.      Copy of the Certificate of Organization of MDL Fishing, LLC ("MDL"), which was produced by Plaintiffs during the course of this litigation and marked as Exhibit 5 at the Deposition of Wayne Daley.

4.      Copies of relevant portions of the Deposition of Wayne Daley ("Daley Depo."), which was taken in this matter on May 3, 2006.

5.      Copy of Exhibit A to the Wayne Daley's Answers to MAN Engines' First Set of Interrogatories.

6.      Copy of Plaintiffs' Expert Witness Disclosure dated June 9, 2006.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 26th DAY OF SEPTEMBER, 2006.

/s/ Peter G. Hermes
Peter G. Hermes

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 26, 2006.

/s/ Eric C. Hipp
Eric C. Hipp

G:\DOCS\ECH\Clients\MAN Engines\Daley 15760\Pleadings\Affidavit of Peter Hermes.doc

# Manufacturer's Statement of Origin
## for a Boat Sold in the State of

*Ocean Yachts*

The undersigned manufacturer hereby certifies that the new boat described below, the property of said manufacturer, has been transferred this __24__ day of __June__ 19 __99__ on Invoice No. __48-139__ to:

Dealer's Name __Oyster Harbors Marine, Inc.__

Street Address
or R.F.D. and Box No. __122 Bridge Street__

City, State and Zip Code __Osterville, MA  02655__

### DESCRIPTION OF BOAT

**Type of Boat:** ☐ Runabout ☐ Houseboat ☐ Open Utility Boat ☒ Cruiser ☐ Sailboat ☐ Pontoon Boat ☐ Canoe ☐ Other (Describe) _____

Model __48'Super Sport__ Model Year __2000__
Manufacturer's Hull Identification Number (HIN)
__XYU13948F900  S__

**Propulsion:** ☒ Inboard ☐ Outboard
If Inboard/Outboard, Jet or V Drive specify by circling type. ☐ Sail Only ☐ Manual

**Fuel:** ☐ Gasoline ☒ Diesel ☐ Other (Describe) _____

**Hull Material:** ☐ Plastic ☐ Steel ☐ Aluminum ☐ Wood ☐ Other (Describe) _____
__FIBERGLASS__

Length Overall: __48__ Ft. __8__ In.
(Exact measurement required)
Beam Overall: __16__ Ft. __0__ In.

**U.S. Coast Guard Capacity Plate Information:** (Where Applicable)
Maximum Horsepower Rating _____
Maximum Persons Capacity in Whole Persons _____
Maximum Weight Capacity (persons, Motor, gear, etc.) _____

The manufacturer further certifies that this was the first transfer of such new boat, and that all information given herein is true and accurate to the best of his knowledge.

OCEAN YACHTS, INC.
(Firm Name)

By _____
(Authorized Signature)        (Title or Position)

(The space below is provided for the name and complete address of your firm)

Firm Name __OCEAN YACHTS, INC.__

Street Address __ROUTE 883__   Box No. _____

City __WEEKSTOWN__   State __NJ__ Zip __08215__

WD 00327

## FIRST ASSIGNMENT

FOR VALUE RECEIVED, the undersigned hereby transfers this Statement of Origin and the boat described therein to

MDL Fishing, LLC

Address  P.O. Box 619, Canton, MA 02021

and certifies that the boat is new and has not been registered in this or any other state; he also warrants the title of said boat at time of delivery, subject to the liens and encumbrances, if any, as set out below:

| Amt. of Lien | Date | To Whom Due | Address |
|---|---|---|---|
| | | | |
| | | | |

Dated_____ 19_____ at_____

Oyster Harbors Marine  By: _____  VP

Transferor (Firm Name)      Sign Here         Position

Before me personally appeared _Peter Haynih_____ who by me being duly sworn upon oath says that the statements set forth above are true and correct.

Subscribed and sworn to before me this_____ day of_____ 19_____

_____  Notary Public, Date Commission Expires_____

(SEAL)

KATHLEEN KENNEALLY-BROWN
Notary Public
My Comm. Expires June 19, 2003

## SECOND ASSIGNMENT

FOR VALUE RECEIVED, the undersigned hereby transfers this Statement of Origin and the boat described therein to

Address_____

and certifies that the boat is new and has not been registered in this or any other state; he also warrants the title of said boat at time of delivery, subject to the liens and encumbrances, if any, as set out below:

| Amt. of Lien | Date | To Whom Due | Address |
|---|---|---|---|
| | | | |
| | | | |

Dated_____ 19_____ at_____

_____  By:_____

Transferor (Firm Name)      Sign Here         Position

Before me personally appeared_____ who by me being duly sworn upon oath says that the statements set forth above are true and correct.

Subscribed and sworn to before me this_____ day of_____ 19_____

_____  Notary Public, Date Commission Expires_____

(SEAL)

## THIRD ASSIGNMENT

FOR VALUE RECEIVED, the undersigned hereby transfers this Statement of Origin and the boat described therein to

Address_____

and certifies that the boat is new and has not been registered in this or any other state; he also warrants the title of said boat at time of delivery, subject to the liens and encumbrances, if any, as set out below:

| Amt. of Lien | Date | To Whom Due | Address |
|---|---|---|---|
| | | | |
| | | | |

Dated_____ 19_____ at_____

_____  By:_____

Transferor (Firm Name)      Sign Here         Position

Before me personally appeared_____ who by me being duly sworn upon oath says that the statements set forth above are true and correct.

Subscribed and sworn to before me this_____ day of_____ 19_____

_____  Notary Public, Date Commission Expires_____

(SEAL)

WD 00328

**DEPARTMENT OF TRANSPORTATION**
**U.S. COAST GUARD**
**CG-1261 (REV. 9-92)**

# BUILDER'S CERTIFICATION
## AND FIRST TRANSFER OF TITLE

OMB APPROVED
2115-0110

## I. PHASE OF CONSTRUCTION COVERED BY THIS CERTIFICATE

[x] ENTIRE CONSTRUCTION      YEAR PHASE OF CONSTRUCTION   1999

[ ] HULL ONLY      YEAR COMPLETED   1999

[ ] COMPLETION ONLY (HULL BUILT BY ANOTHER)

## II. VESSEL DATA

**A. HULL IDENTIFICATION NUMBER OR HULL NUMBER**   XYU13948F900   S

**D. PLACE OF BUILD (CITY, STATE, COUNTRY)**   Weekstown, NJ

**B. VESSEL NAME (IF KNOWN)**

**C. EQUIPPED WITH ENGINE?**
[x] YES   [ ] NO    OUTBOARD [ ] YES   [x] NO

**E. HULL MATERIAL:**
[ ] WOOD    [ ] STEEL    [x] FIBROUS REINFORCED PLASTIC
[ ] ALUMINUM    [ ] CONCRETE    [ ] OTHER

## III. DIMENSIONS
### (COMPLETE APPROPRIATE DIAGRAM)

[x] SHIP-SHAPE HULL

L= 48'8"   B= 16'0"   D= 6'8"

[ ] SAILBOAT

D1 only if actual hull depth (D) cannot be determined

L=   B=   D1=

[ ] CATAMARAN

L=   B=   B1=   D=

[ ] TRIMARAN

L=   L1=   L2=
B=   B1=   B2=
D=   D1=

[ ] BARGE-SHAPED HULLS

L=   B=   D=

[ ] DECKHOUSES   Houseboats only

(AVERAGE DECKHOUSE DIMENSIONS MUST BE FURNISHED IN ADDITION TO HULL DIMENSIONS)

L=   B=   D=

## IV. UNITED STATES BUILD STATEMENT

[x] ALL MAJOR COMPONENTS USED IN THE PHASE OF CONSTRUCTION COVERED BY THIS CERTIFICATE WERE FABRICATED IN THE UNITED STATES.

[x] ALL CONSTRUCTION AND ALL ASSEMBLY FOR THIS PHASE OF CONSTRUCTION WERE DONE IN THE UNITED STATES.

WD 00329



# UNITED STATES OF AMERICA
## DEPARTMENT OF TRANSPORTATION
## UNITED STATES COAST GUARD



Doley
EXHIBIT NO. 6
5-3-06

HIN: XYU13948F900

# Certificate of Documentation

| VESSEL NAME | OFFICIAL NUMBER | HAILING PORT |
|---|---|---|
| MY DEE LITE | 1083638 | GREEN HARBOR MA |

| GROSS | NET | LENGTH | BREADTH | DEPTH | HULL MATERIAL | SELF PROPELLED |
|---|---|---|---|---|---|---|
| 34 | 27 | 48.7 | 16.0 | 6.7 | FRP | YES |

| PLACE BUILT | YEAR BUILT |
|---|---|
| WEEKSTOWN NJ | 1999 |

| OWNER | OPERATIONAL ENDORSEMENTS |
|---|---|
| MDL FISHING LLC | COASTWISE FISHERY |

COMPLETE RECORDS ON FILE AT: NATL VESSEL DOC CTR

MANAGING OWNER

MDL FISHING LLC
27 TRAYER ROAD
P O BOX 619
CANTON, MA   02021

RESTRICTIONS

NONE

ENTITLEMENTS

NONE

REMARKS

NONE

**WD 00330**

THIS CERTIFICATE MAY NOT BE ALTERED EXCEPT BY AFFIXING OFFICIAL RENEWAL AND ADDRESS CHANGE DECALS ON THE REVERSE.

| ISSUED AT   NATL VESSEL DOC CTR | SIGNATURE AND SEAL |
|---|---|
| ISSUE DATE   JULY 29, 1999 | Rhonda S. Gay |
| THIS CERTIFICATE EXPIRES ON THE LAST DAY OF JUL00 UNLESS RENEWED BY DECAL ON REVERSE. RSG | RHONDA S. GAY  DOCUMENTATION OFFICER |

PREVIOUS EDITION OBSOLETE

SN 7530-01-GF2-9870
CG-1270.1—Form5

## CHANGES OF OWNER ADDRESS
### AFFIX LABEL ISSUED BY DOCUMENTATION OFFICER

| 1. | 2. |
|---|---|
| 3. | 4. |

## CERTIFICATE OF DOCUMENTATION RENEWAL RECORD
### AFFIX ANNUAL RENEWAL DECALS SEQUENTIALLY
### IN THE SPACES PROVIDED BELOW

| 1. | 2. | 3. | 4. |
|---|---|---|---|
| 5. | 6. | 7. | 8. |

*When all renewal spaces are filled, go back to the first position and affix current decals over old decals.*

This vessel must be marked with the Official Number, Name, and Hailing Port shown on the face of this certificate. This original certificate, which must be kept aboard the vessel at all times when the vessel is in operation, must be shown upon the demand of any person acting in an official public capacity.

The person to whom this certificate is issued must surrender it to a Coast Guard documentation officer upon one or more of the following changes: Ownership of the vessel changes in whole or in part; general partners of a partnership owning the vessel change by addition, deletion, or substitution; port of record of the vessel changes; the gross or net tonnages or dimensions of the vessel change; the name of the vessel changes; the restrictions imposed on the vessel change by addition or substitution; legal name of any owner of the vessel changes; a tenant by the entirety owning any part of the vessel dies; a self-propelled vessel becomes non-self-propelled; the trade endorsements for the vessel must be changed by a documentation officer; the discovery of a substantive or clerical error made by the issuing documentation officer; the vessel is placed under the command of a person who is not a citizen of the United States; hailing port of the vessel changes.

Any change in address of managing owner must be promptly reported to a Coast Guard Documentation office.

WD  00331

CG-1270—(rev)

EXHIBIT NO. 5
5-3-06

*Daley*

**FILED**

MAY 2 5 199?

SECRETARY OF THE COMMONWEALTH
CORPORATIONS DIVISION

MDL FISHING, LLC

## CERTIFICATE OF ORGANIZATION

Pursuant to the provisions of the Massachusetts Limited Liability Company Act (the "Act"), the undersigned hereby certifies as follows:

1. **Name of the Limited Liability Company.** The name of the limited liability company formed hereby is MDL FISHING, LLC.

2. **Office of the Limited Liability Company.** The address of the office of the LLC in the Commonwealth at which the LLC will maintain its records in accordance with the Act is:

> Wayne V. Daley
> 27 Trayer Road
> P.O. Box 619
> Canton, Mass. 02021

3. **Agent for Service of Process.** The name and address of the resident agent for service of process for the LLC is:

> Wayne V. Daley
> 27 Trayer Road
> P.O. Box 619
> Canton, Mass. 02021

4. **Date of Dissolution.** The LLC is to have no specific date of dissolution. Upon the death, insanity, retirement, resignation, expulsion bankruptcy or dissolution of a Member (each a "Dissolution Event"), the LLC shall be deemed to have dissolved unless, within ninety (90) days after such date, a majority in interest of its remaining Members affirmatively agree in writing to continue the business of the LLC.

5. **Manager.** The name and address of the sole Manager of the LLC is as follows:

> Wayne V. Daley
> 27 Trayer Road
> P.O. Box 619
> Canton, Mass. 02021

WD 00322

6.    **Execution of Documents.**  The name and address of the person authorized to execute documents on behalf of the LLC to be filed with the Secretary of State of the Commonwealth of Massachusetts is as follows:

Wayne V. Daley
27 Trayer Road
P.O. Box 619
Canton, Mass. 02021

Nadine J. Daley
27 Trayer Road
P.O. Box 619
Canton, Mass. 02021

7.    **Business of the LLC.**  The sole and exclusive purpose of the LLC is to engage in the following business activities:

(a)  To own and operate a commercial fishing and charter business serving the fishing industry and the general public.

(b)  To own and operate all materials and equipment, including boats, to conduct a commercial fishing and charter business.

(c)  To borrow money and otherwise incur indebtedness from third parties and to pledge or otherwise grant security interests in its assets to secure such indebtedness, but only to the extent permitted hereunder;

(d)  To issue membership interests provided for herein and any other securities deemed appropriate by the Members of the LLC;

(e)  To take any and all other action necessary to maintain the existence of the LLC as an entity in good standing under the laws of The Commonwealth of Massachusetts and/or to qualify the LLC; to do business as a foreign entity in any other state in which such qualification, in the opinion of the Members of the LLC, is required; and

(f)  To engage in any lawful acts or activities and to exercise any powers permitted to limited liability companies organized under the laws of The Commonwealth of Massachusetts; provided that any such act, activity or power is related or incidental to and necessary, appropriate or convenient for the

2

**WD 00323**

accomplishment of the foregoing purposes.

    8.    **Restrictions On Action.**  None

    9.    **Restrictions On Right To Amend Certificate of Organization.**  None

    10.  **Maintenance Of Separate Business.**  The LLC shall at all times (a) maintain its books, financial statements accounting records and other corporate documents and records separate from those of any individual, Affiliate or any other entity and characterize itself as a separate entity from any other individual, Affiliate or entity in each and every report, tax return or financial statement, (b) not commingle its assets with those of any individual, Affiliate or other entity, (c) maintain its books of account, bank accounts and payroll separate from those of any individual or Affiliate, (d) act solely in its own name and through its own authorized officers and agents, use separate stationery, invoices and checks and in all respects, hold itself out as a separate entity separate and distinct from its Members and any other entity, (e) make investments directly or by brokers engaged and paid by the LLC or its agents (provided that if any such agent is an Affiliate of the LLC it shall be compensated at a fair market rate for its services), (f) separately manage the LLC's liabilities from those of its Members and all other individuals or Affiliates and pay its own liabilities, including all administrative expenses and compensation to employees, consultants or agents, and all operating expenses, from its own separate assets except that a Member or other Affiliate may pay the organizational expenses of the LLC and maintain a sufficient number of employees in light of the LLC's contemplated business operations, (g) pay from the LLC's assets all obligations and indebtedness of any kind incurred by the LLC, (h) not acquire obligations or security of the LLC's Members or Affiliates, (i) use separate stationery, invoices and checks, (j) not pledge the LLC's assets for the benefit of any entity or make any loans or advances to any entity, (k) correct any known misunderstanding regarding the LLC's separate identity, and (l) maintain adequate capital in light of its contemplated business operations.  The LLC shall abide by all organizational formalities, including the maintenance of current minute books, and the LLC shall cause its financial statements to be prepared in accordance with generally accepted accounting principles in a manner that indicates the separate existence of the LLC and its assets and liabilities. The LLC shall (i) pay all its liabilities, (ii) not assume the liabilities of any Member or other Affiliate or incur liability

3

**WD 00324**

to any owner or its creditors, and (iii) not guarantee the liabilities of any Member or any other Affiliate or any other party.  The officers, directors and Members of the LLC (as appropriate) shall make decisions with respect to the business and daily operations of the LLC independent of and not dictated by any Member or other Affiliate.  The Members of the LLC shall be required to consider the interests of the creditors of the LLC in connection with all actions conducted by the LLC.
For purposes of this Certificate of Organization, "Affiliate" shall have the same meaning as now defined in Section 101 of the United States Bankruptcy Code (the "Code") and shall include all "insiders" (as such term is now defined in Code Section 101) with respect to the LLC, except that the percentage of direct or indirect legal or beneficial interest required to be held by the relevant entity shall be 10%, not 20%.

11.  **Execution of Recordable Instrument**.  The name and address of the person authorized to execute, acknowledge, deliver and record any recordable instrument on behalf of the LLC purporting to affect an interest in real property, whether to be recorded with a registry of deeds or filed with a district office of the Land Court, is as follows:

Wayne V. Daley
27 Trayer Road
P.O. Box 619
Canton, Mass. 02021

IN WITNESS WHEREOF, the undersigned hereby affirms under the penalties of perjury that the facts stated herein are true, as of the 15th day of May, 1999.

Wayne V. Daley
27 Trayer Road
P.O. Box 619
Canton, Mass. 02021

4

**WD 00325**

Page 10

1    A.  Canton, Mass.
2    Q.  Same location as Daley's Auto Service?
3    A.  No.
4    Q.  What is the location of FAB(sic.)?
5    A.  395 Washington Street.
6    Q.  One of the plaintiffs in this case is
7    MDL Fishing, LLC.  What is MDL Fishing, LLC,
8    Mr. Daley?
9    A.  That's just a limited liability
10   corporation that my wife and I set up.
11   Q.  When did you set up that corporation?
12   A.  When we bought the boat back in '99.
13   Q.  When you say, quotes, when we bought
14   the boat, what boat are you referring to?
15   A.  The 48 Ocean yacht.
16   Q.  That's the boat which --
17   A.  That we're all here for, yeah.
18   Q.  And do I take it that you and your
19   wife, Nadine, originally took title to that
20   boat?
21         MR. CRIMMINS:  Objection.
22   A.  Correct.
23         MR. HERMES:  What's the basis for
24   your objection, sir?

Page 11

1          MR. CRIMMINS:  The basis for the
2    objection is that the -- I'll withdraw the
3    objection.
4    BY MR. HERMES:
5    Q.  Can you answer the question?
6    A.  Correct, ourself under MDL Fishing.
7    Q.  Well, now I'm confused.  From whom was
8    the boat purchased?  What entity?
9    A.  From whom?  It was bought from Oyster
10   Harbors Marine.
11   Q.  And did Oyster Harbors Marine execute
12   a bill of sale or other sales documents to
13   someone?
14   A.  Yes.
15   Q.  On the original bill of sale or other
16   sale document, whose name was on it as the
17   purchaser?
18   A.  MDL Fishing.
19   Q.  Do I understand then, sir, that title
20   to the 48-foot Ocean yacht has never been in
21   your name personally, rather it went directly
22   from Oyster Harbors Marine to MDL Fishing?
23   A.  Yes.
24   Q.  Do I also understand the title to the

Page 12

1    yacht has never been in the name of Nadine Daley
2    personally?
3    A.  Yes.
4    Q.  That is a correct statement, sir?
5    A.  That's correct.
6    Q.  And do I understand correctly that you
7    and your wife, Nadine, have some interest in MDL
8    Fishing, LLC?
9    A.  That's correct.
10   Q.  What is the nature of your interest in
11   MDL Fishing, LLC?
12   A.  I'm a 50 percent partner.
13   Q.  Is that with your wife?
14   A.  Correct.
15   Q.  In addition, you are the managing
16   agent of the LLC; is that correct?
17   A.  Correct.
18   Q.  Have you at any time personally ever
19   owned the 48-foot Ocean yacht either alone or in
20   conjunction with another person?
21   A.  No.
22   Q.  And is it a fair statement, sir, that
23   Nadine Daley has never owned the 48-foot Ocean
24   yacht either alone or in conjunction with

Page 13

1    another person?
2    A.  That's correct.
3    Q.  Do you recall when in 1999 MDL Fishing
4    purchased the 48-foot Ocean yacht?
5    A.  I believe it was July 1st.
6    Q.  Prior to that purchase, had you either
7    directly or indirectly through a corporation
8    owned any other boats of a similar type?
9    A.  No.
10   Q.  Had you ever owned any boats
11   personally prior to that?
12   A.  Yes.
13   Q.  Can you tell me what boats you had
14   owned?
15   A.  The boat before that was a 42 Ocean
16   yacht that we bought brand new.
17   Q.  When did you buy that?
18   A.  1992.
19   Q.  Did you have a boat before that?
20   A.  Before that was a 35-foot Ocean yacht
21   that we bought brand new.
22   Q.  And when did you buy that boat?
23   A.  1988.
24   Q.  Did you own any boats prior to that?

4 (Pages 10 to 13)

Page 18

1    MR. CRIMMINS: Objection. Just so
2  it's clear, that boat or another Ocean 48?
3    Q.  Well, in answer to a prior question
4  you used the words "that boat." Were you
5  referring to a 48-foot Ocean yacht?
6    A.  Which question was that?
7    Q.  Let's go back and see. I asked, Can
8  you tell me how it was that you made that
9  decision in 1999 that you purchased the 48-foot
10 yacht?
11    MR. CRIMMINS: Just so it's clear,
12 what I'm trying to distinguish is between him
13 being on the particular Ocean 48 that he bought
14 or another one at a boat show. In other words,
15 you can have several Porsches, and you decide to
16 buy a Porsche but not necessarily the one that
17 he ended up purchasing.
18 BY MR. HERMES:
19    Q.  Prior to the time you purchased the
20 48-foot Ocean yacht or MDL Fishing purchased the
21 48-foot Ocean yacht in July 1999, were you ever
22 on that particular boat?
23    A.  The boat I purchased?
24    Q.  Yes, sir.

Page 19

1    A.  Yes, down at the factory.
2    Q.  You mentioned that a 48-foot Ocean
3  yacht was the type of boat that you and your
4  wife always wanted, correct?
5    A.  Correct.
6    Q.  Had you been on other 48-foot Ocean
7  yachts other than the one MDL purchased?
8    A.  Yes.
9    Q.  On how many occasions?
10   A.  Six or seven.
11   Q.  Had you ever been on sea on that boat?
12   A.  Yes.
13   Q.  That type of boat?
14   A.  Yes.
15   Q.  When you were on sea on that type of
16 boat, do you know what type of engines were on
17 the boat?
18   A.  Two different boats.
19   Q.  Can you tell me with respect to the
20 two boats that you were on, the two 48-foot
21 Oceans, can you tell me what engines were on
22 those boats, if you know?
23   A.  One had the 800 MANs, which is in my
24 boat, and one had the 3196 Caterpillars.

Page 20

1    Q.  Now, when MDL purchased the 48-foot
2  Ocean in July 1999, was there a choice of
3  engines available in that boat?
4    A.  I believe there was three choices.
5    Q.  What were the three choices, sir?
6    A.  I believe it was Detroit's, Cat's and
7  MAN's.
8    Q.  And do you know who it was who made
9  the determination that the boat that was
10 purchased by MDL would have 2800 horsepower MAN
11 engines in it?
12   A.  Myself.
13   Q.  Can you tell me why you made that
14 determination?
15   A.  Basically for the extra horsepower.
16 And the Caterpillar engines they were offering,
17 they were having a lot of problems with them.
18   Q.  Did you consider using the Detroit's?
19   A.  No, I did not.
20   Q.  Why not?
21   A.  I don't remember.
22   Q.  Were you familiar with the cutout
23 feature of the MAN engines?
24   A.  I don't understand.

Page 21

1    Q.  Did you understand at any time prior
2  to July 1999 that the MAN 800 horsepower engines
3  had a feature under which at a certain lower rpm
4  they operated on four cylinders and then
5  operated above a certain rpm level at 8
6  cylinders?
7    A.  Yes.
8    Q.  Is there a term which you use to refer
9  to that feature?
10   A.  They drop cylinders is what they do.
11   Q.  Was that feature something that was of
12 interest to you when MDL purchased the boat?
13   A.  No.
14   Q.  Were you aware that that was a feature
15 of the engines when MDL purchased the boat?
16   A.  Yes.
17   Q.  How did you become aware that that was
18 a feature of the engines?
19   A.  I did a lot of studying beforehand and
20 knew that those engines drop cylinders at an
21 idle.
22   Q.  What was your understanding of the
23 reason for that feature?
24   A.  To control soot and smoke at low rpm

6 (Pages 18 to 21)

Wayne Daley

Page 34

1    A.  Why were they installed?
2    Q.  Yes.  Why did you want them on the
3  48-foot Ocean?
4    A.  Because the boats are too fast at an
5  idle, and if you want to fish, you have to slow
6  the boat down.
7    Q.  What does a trolling valve do, as you
8  understand it?
9    A.  I know exactly what it does.  It makes
10  the transmissions -- the clutch plates slip so
11  you don't get full power from the engine through
12  the transmission to the propeller shaft and
13  prop.
14    Q.  Do you know who installed the MAN
15  engines in the 48-foot Ocean that MDL purchased?
16    A.  Ocean Yachts.
17    Q.  And what's the basis for that
18  knowledge?
19    A.  Ocean Yachts is the producer of the
20  boat.
21    Q.  What did you understand in general
22  terms that Ocean Yachts was to produce for you
23  when MDL purchased the 48-foot Ocean?
24    A.  I don't understand that question.

Page 35

1    Q.  Okay.  You dealt with Oyster Harbors
2  Marine with respect to the purchase of the
3  48-foot Ocean, correct?
4    A.  Correct.
5    Q.  What did Oyster Harbors Marine do for
6  you with respect to the purchase of the 48-foot
7  Ocean?
8        MR. CRIMMINS:  Objection.
9        You can answer.
10    A.  Ordered the boat from Ocean Yachts.
11    Q.  Was it your understanding that Ocean
12  Yachts would provide you with a fully-equipped
13  boat?
14    A.  Yes.
15    Q.  Prior to the delivery of the boat, did
16  you visit with Ocean Yachts at any time with
17  respect to the boat that MDL was buying?
18    A.  Several times.
19    Q.  Where did you go?
20    A.  Egg Harbor, New Jersey.
21    Q.  What is Egg Harbor near, if you know?
22    A.  Atlantic City.
23    Q.  Okay.  That begs a question I'm not
24  going to ask.

Page 36

1        Did you discuss with anyone at Ocean
2  Yachts the installation of the 800 horsepower
3  MAN engines on the yacht?
4    A.  Yes.
5    Q.  With whom?
6    A.  I don't recall.  I believe he was a
7  sales manager for Ocean Yachts.  I do not
8  remember his name.
9    Q.  What was said about the MAN engines,
10  as best you recall?
11        MR. CRIMMINS:  Don't guess.
12    A.  Basically that they had been using
13  these in different boats, and they had had good
14  luck with these engines.
15    Q.  Now, do you know precisely what it was
16  that MAN supplied?
17        MR. CRIMMINS:  To who?
18        MR. HERMES:  To this boat.
19        MR. CRIMMINS:  Objection.
20        You can answer if you understand.  You
21  can answer the question if you understand.
22    A.  Ask the question again, please?
23    Q.  Let me do it this way.
24        You have as a defendant in this case

Page 37

1  Twin Disc, Inc.; do you not?
2    A.  Yes.
3    Q.  You have in this case Ocean Yachts,
4  Inc., correct?
5    A.  Yes.
6    Q.  And you have Performance Diesel, Inc.
7  as a defendant?
8    A.  Yes.
9    Q.  And as I understand it, MAN Engines is
10  a defendant in this case, and MAN Engines
11  supplied two 800 horsepower engines, correct?
12    A.  Correct.
13    Q.  What came with the engines supplied by
14  MAN Engines as opposed to those portions of the
15  boat or parts of the boat or equipment in the
16  boat supplied by someone else?
17        MR. CRIMMINS:  Objection.
18        You can answer.
19    A.  I believe just the engines.
20    Q.  What did Twin Disc provide?
21    A.  The transmissions.
22    Q.  What was included within the
23  transmission?
24        MR. CRIMMINS:  Objection.

10 (Pages 34 to 37)

Page 38

1    You can answer.
2    A.   Just the transmissions.
3    Q.   Where did the engines stop and the
4  transmissions start, Mr. Daley?
5    A.   I believe the engines are shipped to a
6  distributor, which is PDI in Texas, and PDI, I
7  believe, matches up the transmissions with
8  respect to Ocean Yachts' specs for the
9  particular boat.
10   Q.   There's been reference in various
11  documents I've seen to couplings.  Do you recall
12  seeing that term used?
13   A.   Yes.
14   Q.   In this context, what are couplings?
15   A.   It's a silicone, rubber coupling that
16  goes between the engine and the transmission.
17  What it does is it stops torsional vibration
18  from traveling from the engine through the
19  transmission and through the drive train.
20   Q.   To your knowledge who was it who
21  provided the couplings with the 48-foot Ocean?
22         MR. CRIMMINS:  Originally?
23         MR. HERMES:  Yes.
24   A.   The way it was explained to me, that

Page 39

1  MAN is supposed to do vibration analysis on each
2  engine.  They send the specs to Twin Disc.  Twin
3  Disc sends the specs to their coupler
4  manufacturer.  They tell them what should be
5  used, and that's what's applied.
6    Q.   When you say "they," who's the they?
7  The coupler manufacturer?
8    A.   Yeah.  There's two couplers that were
9  involved in this boat, and I believe one was
10  named Sentinel, and one was named Vulcan.
11   Q.   Do I take it from your answer that the
12  couplings originally installed on the boat were
13  not provided by MAN?  They did not come as part
14  of the engines?
15         MR. CRIMMINS:  Objection.
16   A.   I don't know that for a fact.
17   Q.   You don't know one way or another?
18   A.   Just what I've been told.
19   Q.   But if I understand your prior answer,
20  what you said was that certain torsional
21  vibration analysis was supposed to have been
22  provided by MAN to Twin Disc, correct?
23   A.   Correct.
24   Q.   And then Twin Disc provided that

Page 40

1  analysis to a third party, correct?
2    A.   Correct.
3    Q.   And the third party was to make the
4  determination regarding what couplings were to
5  be used, correct?
6         MR. CRIMMINS:  Objection.
7         You can answer.
8    A.   I can't say what brand name.  What
9  style of their own coupling would be used.
10   Q.   But so far as you understand it, the
11  couplings originally installed on the boat were
12  not couplings manufactured by MAN?
13   A.   Yes.
14   Q.   That's a correct statement?
15   A.   That's correct.
16   Q.   And the couplings were not installed
17  on the boat by MAN?
18   A.   I don't know.  I can't answer that.
19   Q.   Well, do you know whether or not MAN
20  actually installed the engines on the Ocean
21  48-foot yacht?
22   A.   They did not.
23   Q.   Does that suggest to you that MAN also
24  did not install the couplings?

Page 41

1    A.   That would make sense.
2    Q.   And you know that MAN did not install
3  the transmission, correct?
4    A.   That's correct.
5    Q.   Now, when you say "transmission," what
6  do you include within the transmission?  Let's
7  start at the engine and go toward the aft of the
8  boat.  How far back does the transmission go?
9    A.   The transmission bolts up to the
10  engine.
11   Q.   That's on one side.  Where did the
12  shaft attach?  To the engine?
13   A.   To the transmission.
14   Q.   So you've got engines, transmission,
15  shafts, propeller, correct?
16   A.   Correct.
17   Q.   And so far as you know, the only
18  portion of the power package -- engine,
19  transmission, shafts, propeller -- that was
20  provided by MAN was the engines, correct?
21   A.   Correct.
22   Q.   If you look at paragraph 11 of the
23  complaint, there is reference to certain
24  problems being experienced within a year

11 (Pages 38 to 41)

Page 74

1  yacht after the new injector pumps were
2  installed?
3      A.   Yes.
4      Q.   The last line of paragraph 14B refers
5  to certain vibrations being substantially worse
6  than before the repair work.
7          Can you tell me what vibrations were
8  substantially worse?
9      A.   The vibration on the starboard side.
10     Q.   Was that investigated?
11     A.   Yes.
12     Q.   Was a determination ever made why the
13 vibration was substantially worse on the
14 starboard side?
15     A.   Ask that question again, please?  Was
16 it ever made?
17     Q.   No.  The question -- you've told me, I
18 believe, that after the installation of the new
19 injector pumps, the vibrations were
20 substantially worse on the starboard side,
21 correct?
22     A.   Correct.
23     Q.   And my question to you was was a
24 determination made why the vibrations were

Page 75

1  substantially worse on the starboard side after
2  the new injector pumps were installed?
3      A.   There were several different answers,
4  and they kept going around in circles trying to
5  repair this problem, and they never solved the
6  problem.
7      Q.   Does that problem continue to exist,
8  or did that problem continue to exist as of the
9  time the boat was last used?
10     A.   Yes.
11     Q.   In paragraph 14C there is reference to
12 Ocean Yachts performing a new alignment on the
13 transmission.
14         Did that solve the problem?
15     A.   No.
16     Q.   Do you have any idea as you sit here
17 this morning what would solve the problems that
18 you've observed?
19         MR. CRIMMINS:  Again, with respect
20 to vibration?
21         MR. HERMES:  Yes.
22     A.   I do not.
23     Q.   Are there any other problems with the
24 48-foot Ocean yacht other than vibrations about

Page 76

1  which you are making claim in this action?
2      A.   I think it's all combined, the
3  excessive soot, the vibration.
4      Q.   Anything else?
5      A.   Just the mechanical things that have
6  gone wrong with that starboard side, whatever's
7  wrong with it.
8      Q.   As you sit here today, do you believe
9  that the port engine is operating properly --
10 has been operating properly?
11     A.   I do.
12     Q.   For how long has it been operating
13 properly?
14     A.   The six, seven years I've had the
15 boat, I've never had a problem with the port
16 side except they had to redo the transmissions.
17 I believe the engine is running fine.
18     Q.   And the current coupling on the port
19 side is what kind of a coupling?  Is it a
20 Vulcan?
21     A.   Yes.  They changed them both and
22 rebuilt both transmissions at the same time.
23     Q.   Other than these engine-related
24 problems, are there any other problems with the

Page 77

1  operation of the boat that are at issue in the
2  lawsuit that you've brought?
3          MR. CRIMMINS:  Objection.
4          You can answer.
5      A.   Not that I can think of.
6      Q.   Let me give you an example.  You are
7  not complaining there's a crack in the hull
8  because of the vibrations from the -- in the
9  bow, say, because of the vibrations from the
10 engine?
11     A.   Not that of I've seen.
12     Q.   This is your opportunity to tell me
13 everything that's wrong with that boat that you
14 attribute to MAN Engines.  Please, tell me
15 everything that's wrong with that boat that you
16 attribute to MAN Engines.
17         MR. CRIMMINS:  Beyond what he's
18 already testified to, or are you opening it up?
19 BY MR. HERMES:
20     Q.   There's the soot and the vibrations.
21 Is there anything else?
22         MR. CRIMMINS:  Objection.
23     A.   Everything that I've already told you,
24 the transmission cracking, the transmission

20 (Pages 74 to 77)

Page 78

1  mount cracking.
2     Q.   I understand your prior testimony, but
3  anything else beyond that, sir?
4     A.   No.
5     Q.   Would you look at page five of Exhibit
6  Number 1, paragraph 18.  Paragraph 18 refers to
7  the plaintiffs having agreements with each of
8  the defendants.
9        Can you identify any written agreement
10 that MDL has with MAN Engines?
11    A.   No.
12    Q.   Can you identify any oral agreement
13 that MDL has with MAN Engines?
14    A.   Just the warranty they offer.
15    Q.   Other than the warranty, can you
16 identify any agreement between MDL and MAN
17 Engines?
18    A.   Just what they told me they would fix
19 that they never fixed.
20    Q.   Well, when you say "they," to whom are
21 you referring?
22    A.   MAN Engines.
23    Q.   Whom?
24    A.   Everybody involved.

Page 79

1     Q.   And what did they tell you they would
2  fix?
3     A.   The vibration problem and the soot
4  problem.
5     Q.   Then I take it that there are, in
6  broad terms, two agreements.  One is the
7  warranty that is given, correct, that's one?
8     A.   Correct.
9     Q.   And the other is certain promises you
10 believe were made to you about making repairs to
11 the boat, fixing the vibration and soot
12 problems, correct?
13    A.   Correct.
14    Q.   Can you point to any other written
15 agreements between -- other than whatever those
16 two are, apart from those, any other written
17 agreements that exist between MAN Engines on the
18 one hand and you, your wife, or MDL on the
19 other?
20    A.   Actual agreements, no.
21       I do believe that MAN Engines faxed me
22 some information on what they were going to do
23 to repair it.
24    Q.   Do you recall when that was?

Page 80

1     A.   I do the not.
2     Q.   Do you still have that document?
3     A.   I think I do.
4     Q.   What, if anything, that has been done
5  by MAN Engines has been unfair and deceptive?
6        MR. CRIMMINS:  Objection.
7        You can answer.
8     A.   All the promises they made that they
9  would repair it, that they wouldn't let it go.
10    Q.   If the vibration problems were not
11 caused by the engines, that it was caused by
12 something else in the boat, is it your
13 contention that MAN has an obligation to solve a
14 problem unrelated to the operation of its
15 engines?
16       MR. CRIMMINS:  Objection.
17       You can answer.
18    A.   Unrelated to the engines?
19    Q.   Yes, sir.
20    A.   No.
21       (Exhibit 2 marked
22       for identification)
23 BY MR. HERMES:
24    Q.   Mr. Daley, let me show you a document

Page 81

1  marked as Exhibit 2.  It is captioned Answers of
2  the Plaintiff Wayne Daley to First Set of
3  Interrogatories by Defendant MAN Engines &
4  Components, Inc.
5        (Pause)
6  BY MR. HERMES:
7     Q.   Have you had the opportunity to
8  examine Exhibit Number 2, Mr. Daley?
9     A.   Yes.
10    Q.   Does your signature appear on page 11?
11    A.   Yes.
12    Q.   And above your signature are the words
13 "Signed under the pains and penalties of perjury
14 this 14 day of Oct, 2005," correct?
15    A.   Yes.
16    Q.   Did you sign these answers to
17 interrogatories on or about October 14th of
18 2005?
19    A.   Yes.
20    Q.   And at the time that you did so, did
21 you believe that the answers were true and
22 accurate?
23    A.   Yes.
24    Q.   Has anything come to your attention

21 (Pages 78 to 81)

Page 78

1  mount cracking.
2     Q.  I understand your prior testimony, but
3  anything else beyond that, sir?
4     A.  No.
5     Q.  Would you look at page five of Exhibit
6  Number 1, paragraph 18.  Paragraph 18 refers to
7  the plaintiffs having agreements with each of
8  the defendants.
9        Can you identify any written agreement
10 that MDL has with MAN Engines?
11    A.  No.
12    Q.  Can you identify any oral agreement
13 that MDL has with MAN Engines?
14    A.  Just the warranty they offer.
15    Q.  Other than the warranty, can you
16 identify any agreement between MDL and MAN
17 Engines?
18    A.  Just what they told me they would fix
19 that they never fixed.
20    Q.  Well, when you say "they," to whom are
21 you referring?
22    A.  MAN Engines.
23    Q.  Whom?
24    A.  Everybody involved.

Page 79

1     Q.  And what did they tell you they would
2  fix?
3     A.  The vibration problem and the soot
4  problem.
5     Q.  Then I take it that there are, in
6  broad terms, two agreements.  One is the
7  warranty that is given, correct, that's one?
8     A.  Correct.
9     Q.  And the other is certain promises you
10 believe were made to you about making repairs to
11 the boat, fixing the vibration and soot
12 problems, correct?
13    A.  Correct.
14    Q.  Can you point to any other written
15 agreements between -- other than whatever those
16 two are, apart from those, any other written
17 agreements that exist between MAN Engines on the
18 one hand and you, your wife, or MDL on the
19 other?
20    A.  Actual agreements, no.
21       I do believe that MAN Engines faxed me
22 some information on what they were going to do
23 to repair it.
24    Q.  Do you recall when that was?

Page 80

1     A.  I do the not.
2     Q.  Do you still have that document?
3     A.  I think I do.
4     Q.  What, if anything, that has been done
5  by MAN Engines has been unfair and deceptive?
6        MR. CRIMMINS:  Objection.
7        You can answer.
8     A.  All the promises they made that they
9  would repair it, that they wouldn't let it go.
10    Q.  If the vibration problems were not
11 caused by the engines, that it was caused by
12 something else in the boat, is it your
13 contention that MAN has an obligation to solve a
14 problem unrelated to the operation of its
15 engines?
16       MR. CRIMMINS:  Objection.
17       You can answer.
18    A.  Unrelated to the engines?
19    Q.  Yes, sir.
20    A.  No.
21       (Exhibit 2 marked
22       for identification)
23 BY MR. HERMES:
24    Q.  Mr. Daley, let me show you a document

Page 81

1  marked as Exhibit 2.  It is captioned Answers of
2  the Plaintiff Wayne Daley to First Set of
3  Interrogatories by Defendant MAN Engines &
4  Components, Inc.
5        (Pause)
6  BY MR. HERMES:
7     Q.  Have you had the opportunity to
8  examine Exhibit Number 2, Mr. Daley?
9     A.  Yes.
10    Q.  Does your signature appear on page 11?
11    A.  Yes.
12    Q.  And above your signature are the words
13 "Signed under the pains and penalties of perjury
14 this 14 day of Oct, 2005," correct?
15    A.  Yes.
16    Q.  Did you sign these answers to
17 interrogatories on or about October 14th of
18 2005?
19    A.  Yes.
20    Q.  And at the time that you did so, did
21 you believe that the answers were true and
22 accurate?
23    A.  Yes.
24    Q.  Has anything come to your attention

Page 202

1    Q.  And he specifically identified the
2  vibration problem on the starboard side?
3    A.  Yes.
4    Q.  And did he tell you what was done, if
5  anything, to correct the problem?
6    A.  They removed and replaced the
7  injection pump and had it calibrated.
8    Q.  And when you took possession of the
9  vessel after purchasing it, and again, I'm just
10  focusing on the 48-foot vessel, there was no
11  vibration problem?
12    A.  No.  Before I purchased it, we sea
13  trialed it.
14    Q.  Can you look at -- it's the same
15  exhibit that you were just looking at, your
16  answers to interrogatories, but focusing on your
17  Exhibit A to your answers.
18        MR. CRIMMINS:  What page?  Just
19  give me a date.
20  BY MS. KURES:
21    Q.  The first date that's on there, up at
22  the top, next to the date column, actually.  It
23  indicates up on top that the boat's laid up from
24  11/99 to 5/00?

Page 203

1    A.  Correct.
2    Q.  And was that simply for winter
3  storage?
4    A.  Yes.
5    Q.  There was nothing wrong with the boat
6  at that time?
7    A.  No.
8    Q.  Okay.  The first entry that you have
9  on this is from 6/1 of, it actually says 1200,
10  but I assume it's 2000?
11    A.  Yes.
12    Q.  And there's a reference to noticing
13  the exhaust smell and soot in the cabin and
14  engine room.
15        Is this something that sort of built
16  over time, or is it something that you just
17  noticed one day, that there was a lot of soot
18  and exhaust smell?
19    A.  No, that was probably around the first
20  time I noticed it, that it was excessive.
21    Q.  And when you noticed -- when you first
22  noticed this problem with the exhaust and soot,
23  did you contact anyone from Twin Disc?
24    A.  No.  I contacted American Diesel who

Page 204

1  was the MAN dealer in the area.
2    Q.  Did you have any reason to believe
3  when you first noticed this problem with the
4  soot and the smell that it had any relation to
5  the transmissions?
6    A.  No.
7    Q.  Now, you testified previously that at
8  some point during the summer of 2000 that you
9  noticed some debris underneath the transmissions
10  that you determined was from the couplers; is
11  that correct?
12    A.  Yes.  That goes along with the same
13  thing when I first the noticed the soot.
14    Q.  When did you first notice the debris?
15  Was it at the same time that you noticed the
16  smoke and --
17    A.  Yes.  But I was not sure what it was
18  at the time.
19    Q.  When was the first time you contacted
20  someone from Twin Disc?
21    A.  Back in August of 2000.
22    Q.  And that was in response to the debris
23  that you determined was from the couplers; is
24  that correct?

Page 205

1    A.  Well, I had contacted the new MAN
2  dealer in the area, who was Bayside Diesel,
3  first.
4        They came up, looked at it, looked at
5  the boat and told me what it was, that the
6  couplers were coming apart.
7        So they advised me to call either the
8  manufacturer of the boat or Twin Disc, which I
9  called both.
10    Q.  Okay.  And can you tell me what the
11  substance of your conversation was the first
12  time you spoke with somebody from Twin Disc?
13    A.  Basically just what was going to be
14  done and what had to be done --
15    Q.  Who did you speak with?
16    A.  -- who was going to do it.
17        Tim Taggard, I believe.
18        MR. BENNETT:  Excuse me, are you
19  referring to your records, sir, at this point?
20        THE WITNESS:  Yes.
21        MR. BENNETT:  I just want the
22  record to show --
23        MR. CRIMMINS:  He was instructed to
24  do that by counsel.

Page 214

1  weren't okay; is that correct?
2     A.  No.  Right now the transmissions were
3  okay.
4     Q.  When you're making this reference on
5  November 10th of 2000, it was your opinion as of
6  that date, November 10, 2000, that the
7  transmissions were okay?
8     A.  That was after they put them back in,
9  yes, when we sea trialed it.
10    Q.  So at that time when you did your
11 first sea trial after the transmissions were put
12 back in, you were satisfied with the way that
13 the transmissions were operating?
14    A.  Yes.
15    Q.  Do you know whether there was any
16 vibrations as of that date coming from the
17 transmissions?
18    A.  I didn't know.
19    Q.  But it was at this first sea trial in
20 November 10th of 2000 that you experienced the
21 vibrations that you've been complaining about to
22 this date with your vessel?  That was the first
23 time you experienced those?
24    A.  Yes.

Page 215

1     Q.  To the best of your recollection, when
2  was the next time that you had any conversation
3  with someone from Twin Disc?
4     A.  Probably not until, I believe, the
5  next year.  It was still -- everybody was still
6  chasing the vibration.  And they decided, or
7  Twin Disc decided to do a torsional vibration
8  analysis on the boat.
9     Q.  Now, you said that they were chasing
10 the problem and Twin Disc decided to do a
11 torsional vibration.
12       How did Twin Disc find out about the
13 problem that you were having?
14    A.  Phone calls that I made, phone calls
15 that Ocean Yachts had made.
16       This was an ongoing thing.  Every time
17 somebody would look at it, they'd say this was
18 wrong.  The next guy would come in and say, no,
19 this was wrong.  You should redo the engine
20 mounts.  It's in the transmission.  No, it's in
21 the coupler.  No, it's in the engine.  They were
22 all pointing fingers at each other.
23       So Twin Disc decided with Ocean Yachts
24 and MAN to come down and sea trial the boat.  I

Page 216

1  think it was December of that following year.
2     Q.  You referenced --
3     A.  Of course MAN didn't show up.
4     Q.  You referenced phone calls that you
5  made to Twin Disc.
6     A.  Mm-hmm.
7     Q.  Who did you speak with at Twin Disc?
8     A.  Tim Taggard and another gentleman.  I
9  believe it's in this list.  I'd have to go
10 through and look at it.
11    Q.  Do you recall when those telephone
12 calls occurred, to the best of your
13 recollection?
14    A.  It was all that year.  This was an
15 ongoing thing.  Every week I was on the phone.
16    Q.  And what did you say to Mr. Taggard or
17 the other individual whose name you can't
18 remember?
19    A.  I just explained the whole situation.
20 Every time I talked to them about the vibration,
21 it was still there.
22    Q.  Did either Mr. Taggard or the other
23 individuals associated with Twin Disc tell you
24 that they felt the vibrations had something to

Page 217

1  do with the transmission?
2     A.  They weren't sure.  That's why they
3  ordered the TVA, I believe.
4     Q.  Prior to them performing the
5  vibrational analysis, did you ask them to do any
6  repair work on the boat, anything in particular?
7        MR. CRIMMINS:  This is after the
8  first time the transmissions were built?
9        MS. KURES:  Yes.
10    A.  Not that I recall.
11       MR. CRIMMINS:  Or rebuilt.
12 BY MS. KURES:
13    Q.  To the best of your recollection, who
14 was present at the sea trial that you just
15 testified to?
16    A.  Bill Quandt, Rich Long, I think it
17 was, Craig Venne, Ben Crago, Kevin Rantusio, he
18 was there for Ocean Yachts, and myself.  I don't
19 remember if there was an extra -- oh, excuse me,
20 I don't remember if B.G. Sikes was there or not.
21 He was supposed to come.  I don't think he
22 showed up.
23    Q.  Between the time of this sea trial and
24 the time that the transmissions were replaced in

55 (Pages 214 to 217)

| DATE | BOAT LAID UP FROM 11/99 TO 5/00 |
|------|--------------------------------|
| 6/1/12000 | BOAT 11 MONTHS OLD<br>NOTICE EXHAUST SMELL AND SOOT IN CABIN AND ENGINE ROOM<br>CALLED RED FROM AMERICAN DIESEL MAN DEALER |
| 6-20-00 | RED CALLED BACK TOLD ME HE WAS GOING OUT OF BUT POSSIBLY HAD A NEW DEAL IN THE WORKS WITH MAN AND ANOTHER COMPANY<br>AFTER CALLS TO OCEAN AND OYSTER HARBORS I WAS TOLD TO CALL THE NEXT CLOSEST MAN DEALER BAYSIDE DIESEL IN CONN 860-536-2038 |
| 8/14/2000 | MICHAEL CZAPLA FROM BAYSIDE CAME AND TOLD ME THE PARTICLES IN THE ENGINE ROOM<br>ARE FROM THE ENGINE VIBRATION COUPLER BETWEEN THE TRANSMISSION AND THE ENGINE THAT IS BREAKING APART<br>MIKE TOLD ME TO CALL TWIN DISC THE TRANS MANUFACTURE<br>WITHOUT KNOWING IT WAS A MAJOR PROBLEM I CALLED TWIN DISC, MAN, OCEAN, AND OYSTER HARBORS EVERYBODY WAS TELLING ME IT WOULD BE TAKEN CARE OF |
| 8/14/2000 | LEFT MESSAGE FOR TIM TAGARD FROM TWIN DISC 800-558-3208<br>TIM CALLED BACK AND TOLD ME TO CALL KRAFT THE T-DISC DEALER IN MY AREA 781-938-9100<br>I SPOKE TO JAY KINGSLEY AT KRAFT AFTER FAXING ALL THE ENGINE AND TRANS ID NUMBERS<br>AND BILL OF SALES HE PUT ME IN TOUCH WITH LEN CROKEN AT KRAFT TO HAVE A TECH LOOK<br>AT THE BOAT<br>AROUND THIS DATE KRAFT ALSO BECAME THE MAN DEALER IN THE AREA AND RED WAS NOW WORKING FOR THEM |
| 8/22/2000 | SPOKE WITH LEN CROKEN AND HE HAD ME CALL RED 617-719-6854 AND HAVE HIM LOOK AT<br>BOAT HE TOLD ME THE BOAT HAD TO COME OUT OF THE WATER TO REMOVE THE TRANSMISSIONS    TO REPLACE THE COUPLERS<br>HE TOLD ME KRAFT WOULD DO THE JOB UNDER WARRANTY BUT NEEDED THE OK FROM T-DISC<br>THE NEXT TWO WEEKS MAN, TWIN-DISC AND OCEAN WERE ARGUING WHO WAS GOING TO PAY FOR WHAT |
| 9/1/2000 | WAS TOLD BY RED THAT MAN SAID NOT TO RUN THE BOAT BECAUSE IT COULD BREAK THE ENGINE CRANKSHAFT |

# EXHIBIT A

ID # 446781v01/14236-2/ 10.13.2005

| | |
|---|---|
| 10/14/2000 | BOAT IS HAULED I HAVE TO TAKE INTERIOR APART SO THEY CAN PULL THE FLOOR HATCHES<br>AFTER TRANSMISSIONS WERE REMOVED KRAFT TELLS ME THAT THEY HAVE TO BE REBUILT<br>BECAUSE THE COUPLES WERE NOT THE RIGHT ONES SO THE VIBRATION THEY WERE THERE<br>TO STOP EAT UP ALL THE GEARS IN THE TRANSMISSIONS<br>MAN AND TWIN DISC DECIDED TO PUT A DIFFERENT STYLE COUPLER INSTEAD OF THE ONE THEY USED<br>AT FIRST |
| 11/10/2000 | BOAT PUT BACK IN THE WATER WITH REBUILT TRANSMISSIONS AND NEW STYLE COUPLERS<br>SEA TRIAL WITH RED, EVERETT AND MYSELF<br>TRANSMISSIONS OK BUT BAD VIBRATION ON STARBOARD SIDE WHOLE BOAT SHOOK AT IDLE<br>RED CHECKED SHAFT ALIGNMENT AND SAID STARBOARD INJECTION PUMP IS BAD |
| Dec-00 | RED REMOVED PUMP AND HAD IT CALIBRATED AFTER HE INSTALLED THE PUMP RED, EVERETT<br>AND MYSELF HADE ANOTHER SEA TRIAL IT WAS BETTER AT IDLE BUT HAD A WOBBLE AND<br>SHAKE FROM 900 RPM TO 1600 RPM<br>BY THIS TIME IT WAS SO LATE IN THE YEAR THE HARBOR WAS FREEZING AND THE MARINA WAS<br>FORCING US OUT OF THE WATER THE BOAT WAS CONTRACTED TO BE OUT OF THE WATER BY<br>OCT 15TH |
| 12/18/2000 | BOAT HAULED<br>RED TOLD ME WE WOULD GET TO THE VIBRATION IN THE SPRING |
| 12/29/2000 | STEVE FROM LONGPOINT MARINE ON BOAT TO RECALIBRATE GLENDENNING SYSTEM BECAUSE<br>INJECTION PUMP WAS NOT SET PROPERLY. |
| 2001 | |
| 20-Apr | LAUNCH |
| 1-May | AFTER SEA TRIAL TOLD BY RED STARBOARD INJECTION PUMP BAD AGAIN<br>I CALLED OCEAN & MAN AND WAS TOLD TO TALK TO MIKE AT PERFORMANCE DIESEL 281-474-2667<br>THIS WOULD BE THE THIRD TIME THE STARBOARD INJECTION PUMP HAD TO BE CALIBRATED<br>1ST TIME AT OCEAN BEFORE DELIVERY. 2ND BY WA KRAFT 12/2000 |
| 28-May | I TOLD MIKE I WANTED A NEW PUMP AFTER SEVERAL CALLS TO MAN THEY AGREED ON 5/28/2001<br>TO SEND A NEW PUMP |
| 7-Jun | RED PUT NEW PUMP ON BOAT WOULD NOT IDLE KEPT HUNTING NEW PUMP WAS NO GOOD<br>NEW PUMP REMOVED AND SENT TO FLA TO BE CALIBRATED<br>BOAT OUT OF COMMISSION |
| 14-Jun | PUMP PUT BACK ON |

| | |
|---|---|
| 26-Jul | SPOKE WITH JAY KINGSLEY WHO CAME FROM KRAFT. I TOLD HIM WHAT I THOUGHT ABOUT THE DIFFERENT<br>COUPLERS HE WAS GOING TO SEND SOMEONE TO LOOK AT THE BOAT |

| 2-Aug | ANOTHER SEA TRIAL WITH LEE GILLESPIE 603-396-1071 FROM NO. ATLANTIC HE WANTED TO KNOW THE COLOR OF THE COUPLERS HE THINKS IT IS THE ENGINE MOUNTS CAUSING THE VIBRATION<br>HE ALSO SAID THE TRANSMISSIONS HAD METAL IN THE OIL HE PULLED THE SCREENS AND SAID THE TRANSMISSIONS HAD TO BE REBUILT AGAIN. HE TOLD ME THE TRANS COOLERS SHOULD HAVE BEEN REPLACED THE FIRST TIME THE TRANSMISSIONS WERE REBUILT WHEN THE COUPLERS WERE REPLACED<br>2:15PM SPOKE WITH LOID ABOUT ENGINE MOUNTS<br>I CALLED PAM AT KRAFT TO GET COPIES OF RO'S WHEN TRANSMISSION WERE REBUILT<br>LEFT MESSAGE FOR FRANK FROM KRAFT TO SEE IF HE REMEMBERED COLORS OF COUPLERS |
|---|---|
| 5-Aug | COLLECTED STYROFOAM CUPS COVERED IN SOOT (20-30 HOURS) |
| 8-Aug | CALLED KINGSLEY ( HE QUIT ON 8/3/2001) SPOKE TO LEE HE CHECKING TO SEE IF THE WRIGHT MOUNTS WERE USED<br>CALLED RED TO CHECK EXHAUST LEAK<br>NEVER HEARD FROM OCEAN JOHN LEEK SIGNED FOR CERTIFIED LETTER ON 712012001 |
| 22-Aug | SPOKE LOID AND MALCOLM THEY TOLD ME THEY WERE GOING TO SEND SOMEONE TO PUT A NEW INJECTION PUMP<br>ON THE STARBOARD ENGINE ON THE WEEK OF 9/9/2001 |
| 23-Aug | LEE CALLED TO FIND OUT WHAT COUPLERS WERE PUT IN. I FAXED HIM THE RO'S FROM KRAFT<br>LOID CALLED MAN IS SENDING A NEW MAN DEALER FROM CAPE COD |
| 18-Sep | BG SIKES FROM AVLAMAR THE NEW MAN DEALER 888-404-5663 CELL 508-360-3900 CALLS TO MAKE AN APPOINTMENT TO SEA TRIAL AND FEEL VIBRATION |
| 20-Sep | ANOTHER SEA TRIAL BG THINKS IT IS ENGINE MOUNTS AND ALIGNMENT WILL ORDER MOUNTS |
| 24-Sep | SPOKE WITH BG HE IS WAITING TO HEAR FROM MAN<br>SPOKE WITH CLARK BRUNNING FROM MAN WAITING TO HEAR FROM WOLF<br>LEFT MESSAGE FOR SCOTT AT OCEAN 609-965-4616<br>SPOKE WITH MALCOLM PHILLIPS HE SAID HE WOULD MAKE SURE EVERYTHING WAS TAKEN CARE OF |
| 25-Sep | SPOKE WITH BEN CRAGO FROM OYSTER HARBORS TOLD HIM ABOUT VIBRATION AND EXHAUST LEAKS |
| 5-Oct | BG SIKES FROM AVLAMAR PUT A NEW MOUNT ON THE STARBOARD INSIDE BY THE TRANSMISSION SAID HE WOULD BE BACK THE WEEK OF THE 10/15/2001 TO REALIGN THE SHAFT ON THE STARBOARD SIDE |

| 19-Oct | BG CALLED AND TOLD ME MAN REFUSED TO PAY WARRANTY CLAIM. I TOLD HIM I WILL PAY JUST COME FINISH JOB HE SAID HE WOULD BE ON THE BOAT 10/23/2001 |
|---|---|

| 23-Oct | CALLED BG HE WAS AT FORT LAUDERDALE BOAT SHOW |
|--------|---|
| 24-Oct | CALLED LOID HE TOLD ME MALCOLM AND HE WERE DISCUSSING MY PROBLEM WITH MAN AT THE BOAT SHOW |
| 29-Oct | LEFT MESSAGE FOR SCOTT, LOID AND BG |
| 1-Nov  | "     "     "     "     "     "     " |
|        | NO RETURN PHONE CALLS |
| 4-Nov  | LEFT MESSAGE FOR BEN CRAGO |
| 5-Nov  | LEFT MESSAGE FOR BG AND LOID |
|        | BG CALLED LOID TOLD HIM PERFORMANCE WOULD PAY FOR ALIGNMENT AND HE WILL BE AT THE BOAT ON 11/7/2001 |
| 7-Nov  | BG DID ALIGNMENT BUT IT WAS BLOWING TOO HARD WE COULD NOT GO FOR A SEA TRIAL |
| 15-Nov | ANOTHER SEA TRIAL VIBRATION WORSE THAN EVER<br>LEFT MESSAGE FOR LOID AND BG<br>TALKED TO BEN HE SAID HE WOULD TALK TO SCOTT |
|        | NOW ALL THIS TIME THE BOAT SHOULD BE OUT OF THE WATER BY 10/15<br>I HAD TO EXTEND MY INSURANCE AND MY SLIP |
| 16-Nov | BG CALLED AND WILL TALK TO MAN ABOUT CHECKING FUEL SYSTEM |
| 19-Nov | SENT CERTIFIED LETTERS |
| 20-Nov | SCOTT CALLED AND TOLD ME HE WAS GOING TO HAVE A CONFERENCE CALL WITH TWIN DISC AND LOID FROM PERFORMANCE |
| 26-Nov | SCOTT CALLED CONFERENCE AT 11AM |
| 27-Nov | CRAIG VENNE FROM TWIN DISC CALLED AND I HAD TO TELL HIM THE WHOLE STORY 410-337-5977<br>LEE FROM TWIN DISC CALLED AND I HAD TO TELL HIM THE WHOLE STORY<br>HE ASKED ME TO TAKE THE SCREEN OUT OF THE STARBOARD TRANSMISSION TO SEE IF IT WAS FULL OF METAL AGAIN |
| 28-Nov | BOAT WAS TO BE PULLED OUT OF THE WATER. I CALLED AND ASKED TO LEAVE IN |
| 29-Nov | CALLED LEE HE DID NOT GET OK FROM TIM TAGGARD TO DO ANYMORE WARRANTY WORK<br>CALLED LOID AND CRAIG VENNE HE SAID HE WOULD LEE THE OK |
| 30-Nov | LEE CALLED AND TOLD ME HE RECEIVED A EMAIL FROM TWIN DISC AND THEY WANT TO DO A TORSIONAL VIBRATION ANALYSIS<br>LOID CALLED AND WANTS OCEAN AND MAN ON BOARD FOR TVA |
| 3-Dec  | LEFT MESSAGE FOR SCOTT ABOUT BEING ON THE BOAT FOR TVA<br>TALKED TO SCOTT AND BEN ABOUT BEING ON BOARD SCOTT HIRES KEVIN RANTUSIO TO BE ON THE BOAT FOR OCEAN |
| 12-Dec | SCOTT GAVE ME HIS CELL PHONE TO TELL HIM WHAT WAS GOING ON 609-226-2567 |
| 13-Dec | NA ONE WHOLE DAY OF SEA TRIALS FROM 9AM TO 10PM RICH QUANDT, BILL LONG AND CRAIG VEGNE FROM TWIN DISC. BEN CRAGO FROM OYSTER HARBORS. KEVIN RANTUSI0 FOR OCEAN |

ID # 446781v01/14236-2/ 10.13.2005

| | |
|---|---|
| | MAN DID NOT SHOW UP. KEVIN TOLD ME AND BEN THAT THE BOAT VIBRATED SO MUCH HE WOULD BE AFRAID TO USE IT. |
| 14-Dec | WOLF FROM MAN CALLED ME AND ASKED WHY 7.5 MOUNTS WERE ON THE ENGINES. I TOLD HIM |
| | THEY WERE ALL THE ORIGINAL ONES EXCEPT THE ONE BG SIKES CHANGED. |
| 16-Dec | RAN BOAT AND PORT TRANSMISSION WAS LEAKING OIL |
| 17-Dec | SPOKE WITH CRAIG ABOUT LEAK HE SAID THEY WOULD FIX IT |
| 20-Dec | BOAT TAKEN OUT OF WATER |
| | |
| 2002 | |
| 2-Jan | LEFT MESSAGE FOR LOID, SPOKE TO CRAIG WAITING FOR REPORT |
| 3-Jan | BEN CALLED AND GAVE ME KEVIN'S PHONE NUMBER |
| 4-Jan | SPOKE WITH KEVIN HE BELIEVES THERE ARE MANY THINGS THAT ARE CAUSING THE VIBRATION AND CANNOT BELIEVE SOMETHING DIDN'T COME APART 508-648-3470 |
| 10-Jan | LEFT MESSAGE FOR SCOTT HAVE NOT HEARD ANYTHING |
| 15-Jan | LEFT MESSAGE FOR BEN HAVE NOT HEARD ANYTHING |
| 16-Jan | BEN CALLED AND ASKED IF I WENT TO MY ATTORNEY LOID ASKED IF I WOULD WAIT TILL 1/17/2002 |
| 17-Jan | SCOTT AND BEN CALLED TWIN DISC, MAN AND OCEAN TO HAVE A MEETING AT OCEAN ABOUT MY PROBLEM ON 12/21/2002 |
| 18-Jan | BEN CALLED HE IS FAXING ME THE REPORT FROM TWIN DISC |
| 21-Jan | SCOTT CALLED HE RECEIVED REPORT FROM TD |
| 24-Jan | SCOTT WANTS KEVIN TO HAVE PROPS BALANCED |
| 4-Feb | SCOTT MEETING CANCELED TO 2/05/2002 |
| 5-Feb | MEETING TD TO PULL TRANSMISSIONS AND REBUILD OR REPLACE OCEAN TO HELP WITH LABOR MAN TO DO INJECTION PUMPS AND ENGINE MOUNTS AND TVA I TOLD THEM I WANT LETTERS ON WHO WAS DOING WHAT |
| 2/14 & 15 | KEVIN RANTUSIO ON BOAT PULLED EXHAUST, PROPS AND SHAFTS |
| 18-FEB | SPOKE WITH KEVIN HE SAID SHAFT LOG BEARINGS NOT CENTERED, STRUTS NOT CENTERED, STARBOARD ENGINE OFF STARBOARDLEE FROM NO ATLANTIC DROVE DOWN 2 HOURS TO REMOVE TRANSMISSIONS WITH NOTHING TO LIFT THE ENGINES ARRIVED AT 12PM |
| 27-Feb | LOID WAITING FOR TVA FROM TD |
| | LEE SAID HE SENT TVA |
| 11-Mar | LEE PORT TRANS ON THE STAND THINKS METAL FROM 1ST REBUILD NOT REPLACING OIL COOLERS |

| 14-Mar | SPOKE WITH CRAIG ABOUT CHANGING COUPLERS CELL 717-880-9987 |
|---|---|
| 19-Mar | MAN TO SUPPLY 8 NEW 5.5 MOUNTS |
| 20-Mar | SPOKE WITH BRENT WAGNER FROM PDI TO MAKE SURE THEY USE THE RIGHT COUPLERS; THE FIRST COUPLERS WERE CENTENALS THE SECOND ARE VULKINS<br>MAN HAD VIBRATION PROBLEMS AND OR COMPLAINTS SO MAN TRIED THESE NEW CENTENAL COUPLERS AND THEY WORKED IN MY BOAT THERE WAS NO VIBRATION THE FIRST 16 MONTHS BUT THE COUPLERS WOULD NOT STAY TOGETHER<br>SO WHEN THE TRANSMISSIONS WERE REMOVED IN OCT 2000 THE VULKIN COUPLERS WERE INSTALLED AND THAT IS WHEN THE VIBRATIONS STARTED |
| 21-Mar | BRETT CALLED BACK AND SAID THEY ARE THE COUPLERS VULKIN RECOMMENDS |
| 22-Mar | TALKED SCOTT AND CRAIG INTO PUTTING NEW COUPLERS IN THEY USED VULKINS AGAIN |
| 1-Apr | TRANS TO BE INSTALLED WITH 8 NEW REAR ENGINE MOUNTS |
| 3-Apr | TRANS INSTALLED, KEVIN 2 NEW CENTER BEARINGS, STRAIGHTEN RIGHT STRUT, REPOSITION RIGHT CENTER STRUT, REFACE SHAFT COUPLERS, BALANCE PROPS AND STRAIGHTEN SHAFTS |
| 7 -Apr | PORT TRANS WILL NOT SHIFT CALLED RICK PANISH FROM GLENDENNING HE TOLD ME THAT THEY BENT THE SHIFT CABLE AND HE WAS WRIGHT |
| 11-Apr | SEA TRIAL STILL VIBRATING STARBOARD SIDE<br>400 HOUR SERVICE NEW WATER PUMP STARBOARD SIDE<br>VALVE ADJUSTMENT |
| 13-Apr | SEA TRIAL WITH JOHN BOWEN FROM PDI STARBOARD STILL WALKING SIDE TO SIDE |
| 15-Apr | SPOKE WITH DAVE HALL ABOUT WATER PUMP MAN WANT ME TO PAY FOR IT<br>I TOLD DAVID THEY ARE LUCKY THAT'S THE ONLY THING THAT'S GONE ON THAT STARBOARD ENGINE THE WAY IT SHAKES |
| 16-Apr | DAVID SAID HE WOULD GET INTO IT FURTHER |
| 17-Apr | KEVIN RANTUSIO ON BOAT NEW FRONT ENGINE MOUNTS AND ALIGNMENT |
| 19-Apr | KEVIN NEW EXHAUST HUMP HOSES AND REALIGN<br>SEA TRIAL |
| 20 Apr | RAN BOAT STILL SHAKING |

| | |
|---|---|
| 22-Apr | CALLED SCOTT, LOID, JOHN BOWEN AND MIKE FROM PDI TOLD THEM BOAT STILL SHAKING |
| 29 Apr | SCOTT CALLED DID NOT HEAR FROM MALCOLM LEFT MESSAGE FOR LOID<br>I CALLED LEE ASKED FOR FULL REPORT ON TRANSMISSIONS |
| 2-May | LEFT MESSAGE FOR MALCOLM AND LOID |
| 8-May | "          "      SCOTT, CALLED LEE ABOUT TRANS OIL CHANGE |
| 20-May | LEFT MESSAGE FOR SCOTT HAVE NOT HERD ANYTHING |
| 30-May | SENT CERTIFIED LETTERS |
| 10-Jun | SCOTT CALLED WILL TALK TO MALCOLM |
| 11-Jun | BEN CALLED TOLD ME SCOTT CALLED HIM MAN GOING TO PUT NEW INJECTION PUMP ON |
| 12-Jun | TALKED TO SCOTT AND MALCOLM ABOUT SHAKING 281-464-2345 CELL 281-924-0123 |
| | OCEAN AND MAN WILL COME AND SEA TRIAL BOAT |
| 24-Jun | SEA TRIAL WITH SCOTT AND LOID BOTH ACKNOWLEDGE THE PROBLEM LOID TALKS ABOUT PUMPS, INJECTORS,<br>MOUNTS AND ALIGHMENTS AGAIN |
| 2-Jul | SPOKE WITH LOID WHAT'S GOING ON?<br>HE SAID HE HAS BEEN TALKING TO MAN |
| 17-Jul | LOID CALLED HE TALKED TO DAVID HALL AT MAN THEY WANT TO RECALIBRATE THIS PUMP AND I WANT IT<br>REPLACED WITH A NEW ONE 609-980-3701 |
| | I TALKED TO DAVID HALL 800-626-2842 HE TOLD ME IT WOULD TAKE 6-8 WEEKS TO GET A NEW<br>PUMP FROM GERMANY I TOLD HIM TO DO IT, I KNOW HE DID NOT |
| 18-Jul | I LEFT MESSAGE FOR DAVID HALL AND LOID DYE |
| 23-Jul | TALKED TO DAVID HALL HE SAID THEY WERE LOOKING FOR A PUMP |
| 1-Aug | TALKED TO LOID HE HAS NOT HERD FROM MAN HE SAID HE WOULD CALL CLARK BRUNNING AT |
| | MAN |
| 7 -Aug | BEN CALLED TO SEE IF WE WERE GETTING ANYWHERE |
| 12-Aug | LEFT MESSAGE FOR SCOTT HAVE NOT HERD FROM ANYONE I HAVE TO TAKE FURTHER STEPS |
| | SCOTT CALLED ASKED ME TO HOLD OFF HE WOULD HAVE JOHN LEEK CALL MALCOLM |
| | LEEK TALKED TO MALCOLM, MALCOLM CALLED OWNER OF MAN |
| 13 Aug | DAVID HALL CALLED HE IS SENDING A NEW INJECTION PUMP TO PDI IN NEW JERSEY |
| | AFTER A FEW MORE THREATS THE WHEEL IS TURNING AGAIN SCOTT CALLED TO CHECK UP ON DAVID HALL |
| 22-Aug | CALLED LOID WHERE IS THE PUMP, HE WOULD CALL ME BACK<br>HE CALLED AND TOIL ME TO CALL FRED AT PDI IN NJ |
| 27 Aug | LEFT MESSAGE FOR DAVID HALL AND FRED IN NJ |
| | FRED CALLED BACK HE DOESN'T KNOW ANYTHING ABOUT IT AND HIS MECHANIC WAS GOING TO |
| | INSTALL THE PUMP IN GREEN HARBOR |
| 28-Aug | CALLED SCOTT GUESS WHAT SCOTT MORE STORIES FROM MAN, HE SAID HE WOULD CALL MAN |

| | |
|---|---|
| | DAVID HALL CALLED NOW THE PUMP IS GOING KRAFT SO THEY CAN INSTALL |
| 3-Sep | RED CALLED PUMP SHOWED UP, HE WILL REPLACE NEXT WEEK |
| 9-Sep | SEA TRIAL STILL THE SAME! |
| 10-Sep | PAID DIVER TO CHECK ZINCS FOUND STARBOARD PROP NUTS BACKED OFF TO COTTER PIN |
| | THIS HAPPENED THE YEAR BEFORE BECAUSE OF THE VIBRATION |
| | THE DIVER TIGHTEN THE NUTS WITH A WRENCH AND A 4 FOOT BAR |
| 12-Sep | CALLED KEVIN RANTUSIO HE SAID A CASTLE NUT WOULD SOLVE THE PROBLEM |
| 16-Sep | CALLED RED AWAY FOR A WEEK |
| 24-Sep | RED CALLED HE TOLD MAN THE ENGINES NEED NEW INJECTORS TO STOP THE EXCESSIVE SMOKE |
| | AND SOOT IT MAY HELP VIBRATION |
| 26-Sep | RED CALLED HE SPOKE WITH DAVID HALL, NEW INJECTOR COMING FROM GERMANY |
| 30-Sep | CALLED HALL INJECTORS WILL BE HERE IN NOVEMBER |
| 5-Nov | CALLED HALL INJECTORS WILL BE HERE IN DECEMBER |
| 9-Dec | LEFT MESSAGE FOR HALL, TALKED TO SCOTT ABOUT CASTLE NUTS HE AGREED TO PAY FOR THEM (PROP NUTS BACKING OFF FROM VIBRATION) |
| 3/3/2003 | FAXED SCOTT RO FROM GREEN HARBOR MARINA FOR NEW PROP CASTLE NUTS |
| | CALLED DAVID HALL ABOUT INJECTORS |
| 5/1/2003 | RED CALLED INJECTORS CAME IN |
| 5/15/2003 | FRANK FROM KRAFT ON BOAT WE HAD TO SEA TRIAL AGAIN BEFORE THE INJECTORS WERE INSTALLED SO MAN HAD BEFORE AND AFTER RESULTS |
| 5/16/2003 | INJECTORS INSTALLED ANOTHER SEA TRIAL BOAT STILL HAD VIBRATION FRANK TOLD ME THE INSIDE STARBOARD REAR ENGINE MOUNT BRACKET WAS CRACKED WITH NEW INJECTORS STARBOARD SMOKED WORSE THAN PORT ENGINE BOAT STILL FILLING WITH EXHAUST SMOKE FRANK SAID HE OR LENNY WOULD SEND CONDITION REPORT TO MAN CALLED SCOTT TOLD HIM ABOUT CRACKED MOUNT TOOK PHOTO'S OF CRACK |
| 5/19/2003 | CALLED LOID AND SCOTT ABOUT MOUNT, SMOKE AND VIBRATION |
| 5/20/2003 | CALLED LOID AND HE TOLD ME MAN WOULD NOT PAY TO REPLACE MOUNT (THIS IS A STEEL MOUNTING BRACKET THAT CRACKED FROM THE VIBRATION) |
| 5/22/2003 | TOOK ANOTHER DAY OFF AND HAD THE MOUNT WELDED AT THE TOWN PIER |
| 5/30/2003 | FRANK REPLACED THE EXHAUST GASKETS THEY WERE THE WRONG GASKETS, REPLACED TURBO GASKETS AND LISTENED TO NOISE IN THE STARBOARD ENGINE |
| 5/31/2003 | SEA TRIAL STILL THE SAME VIBRATION STARBOARD ENGINE STILL SMOKES MORE THAN PORT STAR WOULD NOT TURN UP TO 2300 RPM PORT WOULD ONLY TURN 2250 RPM |
| 6/2/2003 | CALLED FRANK HE SAID HE OR LENNY WOULD TALK TO MAN 617-908-0155 |

| | |
|---|---|
| 6/12/2003 | SEA TRAIL WITH FRANK TALKED ABOUT NEW INJECTOR PUMP (STAR SMOKE AND VIBRATION) |
| 6/23/2003 | CALLED MAN ASKED FOR DAVID HALL AND WAS TOLD HE WAS NO LONGER WITH MAN I SPOKE WITH DAN MCREE HE WOULD TALK TO ARNO, ARNO FARBOR HE IS THE NEW PERSON IN CHARGE OF WARRANTIES HE WAS NOT THERE 954-946-9062 I LEFT MESSAGE |
| 6/25/2003 | SPOKE WITH LEN NY AT KRAFT HE KNOWS THERE IS A PROBLEM AND WILL FAX REPORTS AND REPAIR ORDERS TO DAN AND ARNO AT MAN |
| 6/30/2003 | LEFT MESSAGE WITH LENNY AND DAN LENNY CALLED BACK AND SAID HE DID FAX THE REPORTS |
| 7/1/2003 | LEFT MESSAGE FOR DAN CELL # 954-242-0603 5:35 P.M. DAN CALLED AND SAID HE COULD NOT HELP I HAD TO TALK TO ARNO |
| 7/2/2003 | 8:17 PAM CALLED MAN SPOKE WITH A WOMAN NAMED PAT SHE WOULD NOT CONNECT ME TO ANYONE BUT DAN MCREE!  800-626-2842 LEFT ANOTHER MESSAGE |
| 7/7/2003 | 8:50 AM CALLED DAN AGAIN AND HE TOLD ME TO CALL EXTENSION 119 CELL 954-383-0068 CALLED LENNY, RED AND FRANK ABOUT TURBO AND INJECTOR LEAKS; 5:30 PM ARNO CALLED ME AND SAID HE DID NOT KNOW ABOUT THE PROBLEM TO FAX HIM THE REPORT |
| 7/8/2003 | FAXED REPORT AND LETTER ABOUT PROBLEMS TO MAN |
| 7/10/2003 | SPOKE WITH ARNO TOLD HIM THE WHOLE STORY FROM THE BEGINNING FIRST ABOUT THE COUPLERS BRAKING APART, THE DIFFERENT COUPLERS THEY INSTALLED, THE VIBRATION, THE FOUR OR FIVE INJECTION PUMPS, THE NEW INJECTORS, THE NEW ENGINE MOUNTS, THE EXCESSIVE SMOKE, THE CRACKED MOUNT, THE REBUILT TRANSMISSIONS, THE PROP NUTS BACKING OFF. HE TOLD ME HE WAS GOING TO GERMANY AND TO CALL HANZ AT 800-626-2842 EXT 1201 I CALLED AND LEFT A MESSAGE HANZ CALLED BACK AND I HAD TO TELL HIM THE WHOLE STORY OVER AGAIN.  HE TOLD ME HE HAD TO TALK TO CLARK BRUNNING AND HE WOULD CALL ME BACK ON MONDAY |
| 7/14/2003 | HANZ LEFT ME A MESSAGE |
| 7/15/2003 | 8:00 AM TALKED TO HANZ, HE TOLD ME I HAD TO WRITE A LETTER TO THE PRESIDENT OF MAN SVEN V. SAALFELD TO GET ANYTHING REPAIRED TALKED TO RED AND HE SAID THE INJECTORS WERE BAD AND THEY COULD BLOW PISTONS 10:30 AM CALLED CLARK BRUNNING AND LEFT MESSAGE CALLED HANZ AND TOLD HIM WHAT RED SAID ABOUT PISTONS AND SOME ONE BETTER MAKE A DECISION NOW RED CALLED AND SAID MAN AGREED TO RE-DO THE INJECTORS |
| 7/21/2003 | KRAFT PULLED INJECTORS AND SENT TO BOSTON |
| 7/23/2003 | INJECTORS REINSTALLED SEA TRIAL STILL VIBRATING AND SMOKING |

| | |
|---|---|
| 8/4/2003 | CALLED FRANK TURBO STILL LEAKING |
| | SENT CERTIFIED LETTERS TO OCEAN, MAN AND OYSTER HARBORS |
| 9/23/2003 | CALLED SVEN LEFT MESSAGE WITH REBECCA |
| 10/2/2003 | 4:30 PM ARNO CALLED SAID HE WAS SORRY IT TOOK SO LONG HE WAS IN GERMANY AND NOW |
| | SVEN IS IN GERMANY THEY WANT TO DO A VIBRATION ANALYSIS ON 10/132003 |
| | HE WILL FAX ME A LETTER |
| 10/3/2003 | REC FAX FROM ARNO |
| 10/8/2003 | 9:05 AM LEFT MESSAGE FOR ARNO TO CONFIRM |
| | REC TEST NOTICE |
| 10/9/2003 | 12:05 AM SENT LETTER |
| | DAN MCREE CALLED ABOUT VA 954-242-0603 |
| 10/14/2003 | SEA TRIAL DAN MCREE AND JERRY 7 AM TO 11 AM (VIBRATION ANALYSIS) |
| | THEY TOLD ME THAT THE VIBRATION IS FROM THE WAY THE ENGINE MOUNTS ARE MOUNTED ON |
| | THE BOATS STRINGERS. |
| 10/15/2003 | SPOKE TO SCOTT TOLD ABOUT STRINGERS HE SAID HE WOULD CALL MAN AND PDI |
| 10/23/2003 | 8:45 AM BRETT FROM PDI CALLED AND SAID HE WOULD SEND SOMEONE TO RE-ADJUST MOUNTS |
| | WITHIN TWO WEEKS |
| 10/28/2003 | BRETT CALLED AND SAID LOID IS COMING TO RE-ALIGN |
| 11/4/2003 | LOID CALLED COMING 11/5 609-980-3701 HE TOLD ME HE WAS GOING TO TAKE LOAD OFF |
| | THE MOUNTS AND RE-ADJUST OR REBALANCE |
| 11/5/2003 | WHEN LOID ARRIVED HE TOLD ME HE HAD NO REPORT FROM MAN AND DID NOT KNOW WHAT TO |
| | DO. HE ALSO TOLD ME THAT HE WAS NOT A MECHANIC. HE DID NOT HAVE TOOLS TO DO THE |
| | RE-ADJUSTMENTS |
| | LEFT MESSAGE FOR SCOTT |
| 11/17/2003 | SEA TRIAL WITH SCOTT FROM OCEAN AND LOID FROM PDI |
| | THEY BOTH FELT THE VIBRATIONS |
| | THEY TALKED ABOUT MOUNTS, STRINGERS, INJECTORS AND INJECTOR PUMPS ALSO ABOUT |
| | MOVING THE STARBOARD OIL FILTER MOUNT |
| | LOID TALKED ABOUT TRANSITION FROM 4 TO 8 CYL ADJUSTING INJECTOR PUMP AND FUEL SUPPLY |
| 11/21/2003 | LOID CALLED AND TOLD ME TRANSITION STOPS AT 825 RPM AND THERE ARE OTHER |
| | ADJUSTMENTS TO PUMP AND FUEL SUPPLY BUT STRINGERS AND MOUNTS HAVE TO BE LEVEL |
| | FIRST |
| 11/25/2003 | KEVIN RANTUSIO CALLED AND ASKED WHAT WAS GOING ON HE RECEIVED A THREATENING |
| | LETTER FROM OCEAN |
| 12/1/2003 | REC LETTER FROM PDI |
| 2004 | 2004 |
| 1/15/2004 | SENT CERTIFIED LETTERS TO OCEAN,MAN AND PDI |

ID # 446781v01/14236-2/ 10.13.2005

| | |
|---|---|
| Feb-04 | MEETING AT MIAMI BOAT SHOW ABOUT FIXING THE VIBRATION ONCE AND FOR ALL WITH BEN CRAGO, PETER MARRIOTT, SCOTT KROWIC AND JOHN LEEK<br>THEY DECIDED TO BRING THE BOAT BACK TO THE OCEAN PLANT IN NEW JERSEY FIX THE STRINGERS AND CHANGE THE MOUNTS IF NEEDED, REPLACE INJECTORS AND TO DO BOTH INJECTOR PUMPS |
| 3/3/2004 | FAXED LIST TO BE COMPLETED AT FACTORY<br>GREEN HARBOR REPLACED CENTER CUTLASS BEARING ON THE PORT SHAFT<br><br>RAY FROM GREEN HARBOR CALLED ME AND TOLD ME THEY HAD TO USE A PORTER-POWER TO JACK THE SHAFT BACK IN PLACE BECAUSE THE ALIGNMENT WAS SO FAR OFF |
| 3/11/2004 | SPOKE TO SCOTT AND TOLD HIM SOMETHING WAS NOT RIGHT |
| 3/15/2004 | LEFT MESSAGE FOR SCOTT AND TOLD HIM TO CALL RAY ABOUT PROBLEM |
| 3/25/2004 | ARNO FROM MAN CALLED AND SAID PDI AND MAN ARE WORKING ON THE VIBRATION AND SMOKE PROBLEMS |
| 3/29/2004 | ARNO CALLED LEFT ME A MESSAGE ASKING IF I HAD ANY PAPER WORK OR DATES OF WHEN THE INJECTOR PUMPS WE DONE BECAUSE THE DID NOT HAVE ANY RECORDS OF THEM BEING REPLACED<br>I CALLED HIM BACK AND GAVE HIM ROUND DATES<br>I TOLD HIM THAT I WAS SURE THAT ALL HIS DEALERS PDI, WA KRAFT AND ALVAMAR THAT HAVE WORKED ON THIS BOAT MUST HAVE SENT IN WARRANTY CLAIMS. I WAS SURE THEY DID NOT WORK ON MY BOAT FOR NOTHING!!! |
| 4/6/2004 | LEFT MESSAGE FOR SCOTT BOAT WAS READY TO GO TO NEW JERSEY |
| 4/7/2004 | SCOTT CALLED AND SAID THEY WOULD DO THE FIBERGLASS REPAIRS, REPAIR THE STRINGERS AND MOUNTS. MAN AND OR PDI WOULD DO THE ALIGNMENT AND THE PUMPS |
| 4/12/2004 | SCOTT CALLED AND SAID THE CAPTAIN WOULD BE THERE ON MONDAY |
| 4/15/2004 | I PICKED UP THE CAPTAIN AND MATES AT NOWOOD AIRPORT THEN BROUGHT THEM TO THE BOAT |
| 4/17/2004 | CAPT JOE WALKER CALLED THEY ARRIVED IN AC AT 7:30 PM 609-841-0211<br>HE TOLD ME HE COULD FEEL THE VIBRATION |
| 4/16/2004 | LEFT MESSAGE FOR ARNO WHAT IS BEING DONE? |
| 4/2004 | SCOTT CALLED ME AND SAID THAT THE STARBOARD CUTLASS WAS BLOWN OUT THAT HAPPENED ON THE WAY TO AC |
| 5/4/2004 | I CALLED MAN ARNO FARBOR NO LONGER WORKS THERE DAN MCREE WAS NOW IN CHARGE OF WARRANTIES LEFT HIM A MESSAGE<br>SCOTT TOLD ME MAN OR PDI RAN THE BOAT ON 5/3/2004 |

| | |
|---|---|
| 5/6/2004 | SCOTT TOLD ME MAN AND PDI ARE NOT GOING TO DO ANYTHING THEY ARE OUT<br>CALLED DAN MCREE AND HE SAID HE WAS WAITING TO HEAR<br>SCOTT'S MOTHER WAS SICK I COULD NOT GET ANY ANSWERS<br>BOAT WAS BROUGHT BACK TO TRUMP MARINA IN AC<br>OCEAN AND MAN WOULD NOT DO ANYTHING ELSE |
| 5/2612004 | WENT TO AC |
| 5/28/2004 | CAPT JOE WALKER AT BOAT FILLED WITH FUEL BOAT LISTING TO STARBOARD SIDE CHECKED FOR<br>WATER OR GEAR EVERYTHING OK BOAT WAS A PIG PEN |
| 5130/2004 | BOAT ARRIVED GREEN HARBOR |
| 6/7/2004 | LEFT MESSAGE SCOTT |
| 6/15/2004 | SPOKE WITH SCOTT ABOUT VIBRATION AND LIST I ASKED SCOTT TO TALK TO JOHN LEEK OR EVEN<br>HAVE A THREE WAY CONVERSATION I WANT OCEAN TO TAKE THIS BOAT BACK. I TOLD HIM I WOULD<br>BUY ANOTHER BOAT IF OCEAN WOULD STAND UP TO THE PLATE |
| 6/21/2004 | CALLED SCOTT HE TOLD ME OCEAN WAS NOT DOING ANYMORE<br>I TOLD HIM TO SEND ME A LETTER OF REFUSAL |
| 6/22/22004 | TOLD BEN ABOUT OCEAN HE SAID HE WOULD SEE WHAT PETER MARRIOTT COULD DO |
| 6/23/2004 | PETER CALLED HE WAS GOING AWAY AND TRY TO TALK TO SONEONE AT OCEAN |
| 6/28/2004 | LEFT MESSAGE SCOTT, TWICE |
| 6/29/2004 | MESSAGE FROM SCOTT, PETER AND BEN ABOUT TRYING TO SELL THE BOAT |
| 7/1/2004 | REC LETTER FROM OCEAN |
| 7/6/20004 | BEN AND PETER CALLED WANT TO LOOK AT LIST AND RUN THE BOAT ON 7/13/ |
| 7/12/2004 | BEN CALLED ME AT BOAT 10AM 7/13 |
| 7/13/2004 | SEA TRIAL BEN AND PETER FELT VIBRATION AND NOTICED THE STARBOARD LIST<br>BEN TOOK PHOTOS<br>PETER SAID HE THINKS THE VIBRATION SHOULD BE ADDRESSED!!!<br>THEY TALKED ABOUT HAVING KEVIN RANTOSIO RE-ALIGN THE MOTORS |
| Aug-04 | I CALLED COASTAL MARINE TO CHECK THE VIBRATION<br>JAMES DOLLIPH CHECKED ENGINE ALIGNMENT AND FOUND BOTH ENGINES OUT OF ALIGHMENT<br>THE STARBOARD HE ALIGNED<br>THE PORT COULD NOT BE ALIGNED ONE OF THE PORT STRUTS HAD TO BE OUT OF ALIGNMENT AND<br>THAT COULD NOT BE DONE IN THE WATER. |
| 9/12/2005 | STARBOARD SHAFT SEAL ALWAYS LEAKED BECAUSE OF SHAKE  AT 45 HOURS IT WAS ALMOST<br>EMPTY, AT 99 HOURS ALMOST EMPTY! |

# JAMES DOLLOFF, PRESIDENT
## COASTAL MARINE SERVICES, INC.
8B Cherry Street
Brant Rock, MA  02020-9999

I have been retained by the plaintiffs, Wayne Daley, Nadine Daley and MDL Fishing, LLC to render expert opinions in their litigation against Twin Disk, Inc., MAN Engines and Components, Inc., Ocean Yachts, Inc., and Performance Diesel, Inc.

My hourly compensation for my expert services is $125.00.

My experience and background is as follows:

- Graduated Maine Telstar Regional High School in 1975

- Served in the U.S..Coastguard from June 1975 to March, 1980.  Received extensive training in the following areas:

  o Engine mechanics
  o Hydraulic mechanics
  o Electrical mechanics

- Head mechanic at Green Harbor Marina in Marshfield, Massachusetts -- 1980-1984

  o Performed mechanical and electrical work on all types of marine engines

- Formed Coastal Marine Services, Inc. in 1984

  o Served as President since 1984 to the present
  o Performed marine and electrical repairs to all types of marine vessels

I have never testified either at trial or in deposition as an expert witness before.  I have authored no publications.

In my opinion, the problems that the Daley's have experienced with their Ocean 48 Yacht, including failure of torsion couplings, improper shaft alignment, and vibrations, were caused by the fact that the MAN 8-cylinder 800 HP diesel engines which were put on the Ocean 48 Yacht were incompatible with the Ocean 48 Yacht. In addition, the extensive vibrations existing on the Ocean 48 Yacht when the engines are running is also likely caused by improper couplers placed on the Ocean 48 Yacht.

My opinions are based upon my own examination of the Ocean 48 Yacht, its engines, and the related equipment accompanying the engines and the transmission beginning in August, 2004. My opinions are also based on my approximately 30 years of experience and training in the area of engine mechanics.

I reserve the right to supplement this expert opinion when additional information is provided by the defendants.

James Dolloff, President
Coastal Marine Services, Inc.

Dated: June 9, 2006